**STUDENT PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, et al.**

v.

**MONSANTO COMPANY.**

No. 83–2040.

United States District Court, D. New Jersey.

Feb. 14, 1989.

Michael Gordon, West Orange, N.J., Carolyn Smith Pravlik, Bruce Terris, Terris, Edgecombe, Hecker & Wayne, Washington, D.C., for plaintiffs.

Davis, Reberkenney Abramowitz, P.A., Cherry Hill, N.J., Robert Blomquist and Kenneth D. Roth, Trial Counsels, for defendant.

## OPINION

VANARTSDALEN, Senior Judge.

### I. INTRODUCTION

The Third Circuit Court of Appeals has cautioned that attorneys' fee applications have the potential for "assum[ing] massive proportions, perhaps even dwarfing the case in chief." *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116 (3d Cir. 1976) (*Lindy II*). It was hoped that having received—on the pending issue of attorneys' fees alone—a total of twenty-six pounds of pleadings, responsive pleadings, and counter-responsive pleadings measuring three feet in thickness, that the proper measure of attorneys' fees and litigation expenses could finally be determined and end this litigation spanning more than half of this decade. Unfortunately however, there has recently been filed a further application for additional attorneys' fees and costs involved in preparing and briefing the present fee application from May 9, 1988 to December 1, 1988, seeking $78,778.34 in additional compensation. Undoubtedly, plaintiffs' counsel will seek additional future compensation as this dispute winds its way through the appellate process. A brief review of the relevant facts is in order.

---

1. For ease of reference, I have abbreviated the papers filed in reference to this matter as follows: Plaintiffs' Application for and Brief in Support of an Award of Litigation Costs, Including Attorneys' Fees and Expert Witness Fees (Plaintiffs' Brief); Plaintiffs' Supplemental Brief in Reply to Defendant's Brief in Opposition to Plaintiffs' Application for an Award of Litigation Costs, Including Attorneys' Fees and Expert Witness Fees (Plaintiffs' Supp. Brief); Plaintiffs' Exhibits (Plaintiff's Ex.); Defendant's Brief in Opposition to Plaintiffs' Application for an

On June 6, 1983 plaintiffs, Student Public Interest Research Group of New Jersey (SPIRG) and Friends of the Earth (hereinafter collectively referred to as plaintiffs), by and through their attorneys Terris, Edgecombe, Hecker & Wayne (Terris firm or plaintiffs' counsel), commenced a citizens' suit against defendant Monsanto Company (Monsanto) pursuant to Section 505 of the Federal Water Pollution Control Act (Clean Water Act), as amended, 33 U.S.C. § 1365. Prior to filing the lawsuit, plaintiffs provided notice of their intention to sue by letter to the Environmental Protection Agency (EPA), the New Jersey Department of Environmental Protection (NJDEP) and Monsanto.

In their complaint, plaintiffs alleged that Monsanto had violated the Clean Water Act by discharging pollutants from its Bridgeport, New Jersey, facility into the Delaware River in violation of the discharge limitations contained in its National Pollutant Discharge Elimination System (NPDES) permit. Plaintiffs alleged over 204 violations of Monsanto's NPDES permit. It should be noted that the violations were taken directly from Discharge Monitoring Reports (DMRs) and Non–Compliance Reports (NCRs) which Monsanto itself had prepared and filed with the EPA and NJDEP in accordance with state and federal reporting requirements. Plaintiffs sought in their complaint, inter alia, declaratory relief, injunctive relief, the imposition of civil penalties of $10,000 per day for each violation and an award of litigation fees and costs.

On December 14, 1983, the Honorable John F. Gerry entered summary judgment in favor of plaintiffs on the issue of liability for 236 violations (from August 4, 1977, through September 12, 1983). Six of those 236 violations occurred subsequent to the filing of the complaint. However, there remained to be resolved the issue of Monsanto's liability for thirty-five permit violations which occurred following Judge Gerry's decision. In January 1988, this case came to trial before me to determine liability as to the additional thirty-five alleged permit violations, the amount of any civil penalties to be assessed against Monsanto for all violations, and the propriety of injunctive or other equitable relief.

Plaintiffs sought the imposition of a maximum penalty of $17,190,000.00 on all claimed violations as set forth in their pretrial proposed findings of fact and conclusions of law. This figure was based in part upon plaintiffs' contention that penalties should be assessed for each day of the month in which there was, on any day of the month, a violation of Monsanto's average daily permitted discharge amount. Plaintiffs additionally urged this court to apply the EPA Civil Penalty Policy in determining the minimum civil penalty to be assessed against Monsanto. Plaintiffs argued that consistent with this policy, the amount of any penalty had to reflect the economic benefit derived by Monsanto from noncompliance, as well as the gravity of the noncompliance. Under this alternative approach, plaintiffs sought the imposition of a minimum penalty of $2,392,066.00 for all claimed violations.

Following a nine-day bench trial, on March 30, 1988, I filed an opinion and order disposing of the outstanding merits of the case. 1988 WL 156691. I concluded therein that no civil penalties should be assessed for pre-complaint, pre-notice violations. Opinion at 14–22. Penalties were determined to be appropriate, however, in thirty-eight of the alleged forty-one post-complaint violations. *Id.* at 22–27. I additionally held that plaintiffs' were entitled to an award of litigation fees and costs pursuant to Section 505(c) of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(c). Opinion at 37. In that regard, the order directed Monsanto to pay plaintiffs' litigation costs, including reasonable attorney and expert witness fees, and provided that if the parties were unable to agree on the amount of such costs and fees plaintiffs

Award of Litigation Costs, Including Attorneys' Fees and Expert Witness Fees (Defendant's Brief); Defendant's Supplemental Brief in Opposition to Plaintiffs' Application for an Award of Litigation Costs, Including Attorneys' Fees and Expert Witness Fees (Defendant's Supp. Brief); Defendant's Exhibits (Defendant's Ex.).

should submit an application to the court on or before April 30, 1988.

Despite attempts to resolve their differences, the parties were unable to agree and plaintiffs submitted the instant fee petition seeking $519,411.80 in attorney's fees, $114,108.39 for expenses and expert witness fees, and a delay enhancement of $155,879.97, for a total claim of $789,400.16. Plaintiffs' Brief at 30. While plaintiffs' counsel are properly entitled to reasonable litigation expenses, including attorney's fees, the claimed sum is excessive and will be reduced in accord with the following discussion.

## II.  DISCUSSION

### A.  *Plaintiffs' Entitlement to Litigation Expenses*

My conclusion that plaintiffs are entitled to reasonable litigation costs and attorneys' fees is amply set forth in my opinion and order entered March 30, 1988. *See* Opinion at 37–38.

### B.  *Underlying Policies of Fee–Shifting Statutes*

■ Plaintiffs' application for the award of attorneys' fees is brought pursuant to Section 1365(d) of the Clean Water Act, which provides in pertinent part that

[t]he court in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate.

An award of attorney's fees in favor of the prevailing party is not mandatory. The "benchmark" of an award under a fee-shifting statute of this nature is that the fees assessed against the non-prevailing party be "reasonable". *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*).

■ In determining whether an award of fees is "reasonable" within the meaning of section 1365(d), the underlying policies of the statute should be considered. One of the main purposes of section 1365(d), as well as that of other federal fee-shifting statutes, is to enhance enforcement of important federal policies through citizen involvement. *Delaware Valley I*, 478 U.S. at 559–60, 106 S.Ct. at 3095–96; *SPIRG v. AT & T Bell Laboratories*, 842 F.2d 1436, 1449 (3d Cir.1988) (*SPIRG v. AT & T*).

■ The United States Supreme Court has enunciated a balancing test to be employed by the court in assessing the reasonable measure of attorney's fees. The attorneys' fee award should be "adequate enough to attract competent counsel to the case," *SPIRG v. AT & T*, 842 F.2d at 1448 (citing *Senate Report on § 1988 of the Civil Rights Act*, S.Rep. No. 1011, 94 Cong., 2d Sess. 6, *reprinted in*, 1976 U.S. Code Cong. & Admin.News 5908, 5913), while avoiding the award of an undue windfall. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 3090–91, 97 L.Ed.2d 585 (1987) (O'Connor, J. concurring) ("[A] court may not enhance a fee award any more than necessary to bring the fee within the range that would attract competent counsel.") (*Delaware Valley II*); *Delaware Valley I*, 478 U.S. at 565, 106 S.Ct. at 3098 ("These [fee-shifting] statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client."). Thus, it follows that not every expense which might ordinarily be charged a firm's fee paying clients is necessarily "reasonable" under the purview of section 1365(d).

■ The Third Circuit has enunciated a two-part test to be used in the calculation of reasonable attorneys' fees known as the "lodestar" approach. The court should first determine the "hours reasonably spent" on the case, and multiply that figure by the "reasonable hourly rate" of compensation for each attorney involved. *Delaware Valley I*, 478 U.S. at 563, 106 S.Ct. at 3097 (citing *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sani-*

*tary Corp.*, 487 F.2d 161, 167 (3d Cir.1973) (*Lindy I*). Second, using the lodestar figure as a starting point, adjustments may be made to that figure in light of "(1) the contingent nature of the case, reflecting the likelihood that hours were invested and expenses incurred without assurance of compensation; and (2) the quality of the work performed as evidenced by the work observed, the complexity of the issues and the recovery obtained," *id.* (citing *Lindy II*, 540 F.2d at 117; *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 168 (3d Cir.1975); *see also In re Fine Paper Antitrust Litigation*, 751 F.2d 562 (3d Cir.1984) (*Fine Paper*), and the party's degree of success. *Institutionalized Juveniles v. Secretary of Public Welfare*, 758 F.2d 897, 918–19 (3d Cir.1985).

## C. *Determination of the Lodestar*

### 1. General Reduction

The first inquiry, then, is to determine the number of hours reasonably spent by plaintiffs in prosecuting this action. In that regard, the fee applicant has the "burden of showing that the claimed rate and number of hours are reasonable." *Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). Plaintiffs' comparison chart at Exhibit 79 shows a total of 3,499.14 hours claimed to have been spent on this case. I note that according to plaintiffs' own interpretation of the time records Monsanto's counsel expended some 732.84[2] fewer hours, or 21% less time, on defense, than did plaintiffs' counsel in prosecuting this action. For the following reasons, I conclude that an overall reduction in plaintiffs' lodestar hours of work by 20% is appropriate, after eliminating certain specific claimed hours.

I do not agree with defendants' blanket assertion that "a defendant's attorney typically invests more time in defending a civil case than a plaintiff's attorney invests in prosecuting it." Defendant's Supp. Brief

at 3 (citing *Ohio–Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646, 659 (7th Cir. 1985); *Samuel v. University of Pittsburgh*, 80 F.R.D. 293, 294 (W.D.Pa.1978). Obviously, who spends more time on a case may vastly differ based on the facts of the case, access to discovery, and competence of counsel. However, in this case plaintiffs' counsel professed to have gained extensive experience, efficiency, and expertise as a result of simultaneously litigating twenty-six parallel cases brought under the Clean Water Act. Plaintiffs' Brief at 14. Thus, the considerably greater amount of time spent by plaintiffs in the course of this litigation is relevant for consideration in modifying the lodestar amount.

It is also appropriate to consider the complexity of the work undertaken by plaintiffs' counsel. *Delaware Valley I*, 478 U.S. at 563, 106 S.Ct. at 3097 (citing *Lindy II*, 540 F.2d at 117; *Merola*, 515 F.2d at 168). In this case, both the violations determined by Judge Gerry, and the additional violations determined to have occurred after September 1983, were based solely upon DMRs and NCRs submitted by defendant Monsanto to the EPA and NJDEP. Opinion at 3. Establishing liability was a minimal task as most of the "work" related to proving the liability of Monsanto for the violations of its NPDES permit was done for plaintiffs by Monsanto's monitoring reports. Plaintiffs were not presented with an unduly difficult, complex, or novel case or one that required a huge amount of time in preparation. Discharges exceeding permit levels create a type of "no fault" liability.

Moreover, by my recollection and trial notes, approximately 50% of plaintiffs' evidence in chief and trial time was spent in the presentation of evidence and testimony by expert witnesses in support of issues upon which plaintiffs did not prevail. Among those issues were the applicability of the EPA civil penalty policy, the use of the EPA "BEN" computer model for deter-

---

**2.** These hourly figures are used for purposes of comparison only. Due to a number of variables such as the inclusion or exclusion of paralegal hours, the calculations utilized by the parties are frequently inconsistent. Thus, for purposes

of determining hours spent on this case, I have decided to refer to plaintiffs' exhibit 4 (Monsanto Specific Hours) to maintain internal consistency.

mining economic benefit, the development and application of the "gravity factor of the civil penalty policy," and the presentation of "expert" testimony by plaintiffs' engineer on the types of technology that Monsanto should have utilized in its wastewater treatment plant to enable it to meet its permit limitations. I conclude that much, if not all, of that testimony was of little or no value whatsoever. Opinion at 13–14. Plaintiffs additionally presented testimony by an ecologist about the harm caused to the environment by Monsanto's discharges. That expert was unable to establish any measurable harm as a result thereof. *Id.* at 13–14. Obviously, much of the time spent by plaintiffs' deposing these experts was similarly nonproductive.

■ The Third Circuit has held that consideration of a party's degree of success in a matter is appropriate in making adjustments to the lodestar figure. *Institutionalized Juveniles,* 758 F.2d 918–19. After considering plaintiffs' degree of success as to the method of determining the amount of the penalties, the relative simplicity of proving liability through defendant's own data, and the economy of time and resources that should have accrued from simultaneous prosecution of twenty-six similar claims, I conclude that an overall reduction of 20% to the Terris firms' lodestar, after eliminating certain specific claimed hours as hereafter discussed, is both reasonable and appropriate. It is, of course, an approximation as to the extent of excessive hours utilized. I believe this reduction appropriately serves the dual interests set forth by the United States Supreme Court of insuring a sufficient fee to attract competent counsel while avoiding the award of an undue windfall or overcompensating for unnecessary and excessive "work". *See Delaware Valley I,* 478 U.S. at 565, 106 S.Ct. at 3098; *Delaware Valley II,* 483 U.S. at 727, 107 S.Ct. at 3087.

In so doing, I reject as unreasonable defendant's argument that a 50% reduction in the lodestar should be made. I similarly reject the plaintiffs' explanation that their substantially greater number of hours spent upon this case can be attributed to the "higher caliber" of their work when compared to that of defense counsel. *See* Plaintiff's Supp. Brief, at 11. Both sides in this litigation presented high caliber work. They also submitted consistently well written and helpful, but overly lengthy briefs, advocating their positions. Plaintiffs are certainly entitled to the distinction of having submitted the greater quantity of paper in this matter, but greater quantity does not necessarily denote superior quality. The Terris firms' paralegal hours will similarly be reduced by 20%, because so much of the time spent on this case appears to be excessive in light of all of the circumstances.

### 2. Hours Reasonably Spent
#### (a) *Overstaffing and Deposition Hours*

■ Specific modifications to plaintiffs' "reasonable hours spent" figure are in order. The grossly excessive hours claimed by plaintiffs' counsel may be explained in part by their practice of overstaffing and/or top-staffing even the most common legal procedures such as routine depositions. For example, as noted by defense attorney Kenneth D. Roth and supported by plaintiffs' exhibits, the Terris firm had two attorneys, Mr. Sunderland and Ms. Pravlik, simultaneously in attendance at twelve of the depositions taken in this case. Defendant's Ex. 1, para. 12X, at 6–7. Mr. Sunderland's 1986 rate is claimed to be $175 per hour. Ms. Pravlik's current rate is claimed to be $160 per hour. Defendant's Ex. 4, at 34. I find particularly unnecessary the presence of two attorneys at depositions of plaintiffs' own witnesses for which they claim 106 hours.[3] I will

---

**3.** The figure of 106 hours claimed by plaintiffs' counsel was determined by adding the hours set forth in plaintiffs' exhibit 4, at 10–11 under the general heading "depositions" and subheadings "General Deposition Activities," "Depositions of Plaintiffs' Expert and Fact Witnesses". It should be noted that under the subsection "Gen-

eral Deposition Activities" only those hours plaintiffs' counsel specifically claims were expended on the *Monsanto* litigation (referred to as the "top number") were included in calculating the 106 hours. *See* Plaintiffs' Ex. 4, at 1 n. 1. In so doing, I explicitly reject the inclusion of the hours the Terris firm allocated for time

therefore divide that number in half, and decrease plaintiffs' hours claimed for depositions by 53 hours.[4]

■ I also agree with defendant that the presence of two attorneys was unnecessary for the depositions of defendant's fact and expert witnesses. Plaintiffs should not be entitled to have both counsel paid by defendant at their full hourly rates (including travel time to and from the depositions) where one is merely taking notes, a duty which could have been attended to by a paralegal, if anyone, and performed much more economically. *See Daggett v. Kimmelman,* 811 F.2d 793, 799 (3d Cir.1987) (stating court would approve hour or fee reductions if district court specified in sufficient detail "the tasks and the hours devoted to them that should have been performed by associates or paralegal."). Since in contrast to the deposition of their own witnesses, the presence of the second attorney may have served some legitimate function at times, the Terris firm's claim of 220 hours [5] will be reduced by 25%. Fifty-five hours will therefore be deducted from plaintiffs' claimed attorneys' hours for the taking of depositions of defendant's proposed witnesses because of "over staffing."

■ Another instance of overstaffing occurred at the trial. Every day of the trial plaintiffs had three attorneys present —Mr. Terris, Ms. Wayne, and Ms. Pravlik; and frequently Mr. Nguyen, a paralegal in the Terris firm. Plaintiffs thus had approximately 60% of the partners in their firm present in court every day of the trial. Seldom in my experience has the presence of more than one attorney per party been absolutely necessary, even in the most complex litigation. Equally reasonably, a partner is frequently assisted by an associate. The presence of three *partners,* however, with all their "meters running" is clearly excessive given that the case was not unduly difficult except where made so by plaintiffs themselves.

■ The very concept of "reasonableness" dictates that at some point the court must impose limitations on the number of counsel who may attend trial and claim compensation from opponents as the result of a fee-shifting statute, lest that number grow out of all proportion to utility. As noted, the presence during trial of two attorneys (but not three) and one paralegal was reasonable, if not absolutely necessary, in this litigation. The Terris firm's claim for 361 attorney-hours spent at trial, Plaintiff's Ex. at 17, will be reduced by

---

billed to all Clean Water Act citizen suits which plaintiffs are litigating and time allocated to this case for time billed generally to the group of Clean Water Act citizen suits which plaintiffs are litigating in the District of New Jersey. Those hours will be disallowed. *See SPIRG v. Anchor Thread,* No. 84–320, slip op. at 17, 1988 WL 49177 (D.N.J. May 13, 1988), *aff'd,* 869 F.2d 592 (3d Cir.1989) ("[T]his court agrees with defendants' assertion that 'it is impossible to determine how and to what extent the individual activity in each of the non-specific files is related to this case....' This Court, can neither 'make a determination of overlapping effort, nor of the value of the time spent between effort devoted to critical issues, and that devoted to routine or clerical efforts.'").

The hours claimed for "General Deposition Activities" were included in this calculation since they are not attributable to any other specific purpose on the basis of the evidence now before me.

**4.** One problem, among many which readily becomes apparent in view of the format of plaintiffs' fee application, is the determination of precisely how to pro rate modifications to the

total number of hours claimed among the several attorneys who worked on this case during various years at various billing rates depending upon their experience level in a given year of this litigation. This is particularly problematic where, during the period in which depositions were taken by plaintiffs, 1984 through 1987, there were at least six different billing rates applicable to work done by Mr. Sunderland and Ms. Pravlik. *See* Plaintiffs' Ex. 4, at 34.

Moreover, there is no way to determine from the evidence now before me which attorney was doing the "lion's share" of the work at the depositions in question, and conversely which attorney's fee should be billed at a lower rate or eliminated. I have therefore concluded it is more appropriate to decrease the number of hours claimed by plaintiffs' counsel rather than attempt to combat the myriad permutations that would exist with any attempt to further modify the "reasonable hourly rate" beyond that discussed *infra,* at 617–20.

**5.** The 220 hour figure was calculated by adding the hours claimed by the Terris firm under the heading "Depositions of Defendant's Expert and Fact Witnesses." Plaintiffs' Ex. 4, at 11.

one-third or 120 hours to compensate for overstaffing.

### (b) *Amici Curiae Brief Hours*

■ Plaintiffs also seek compensation for approximately thirty-nine [6] hours spent on the preparation of amici curiae briefs for the Court of Appeals for the Fourth Circuit and the United States Supreme Court in the appeal of *Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd.*, 611 F.Supp. 1542 (E.D.Va.1985), and the First Circuit in the appeal of *Pawtuxet Cove Marina v. Ciba–Geigy Corp.*, 21 Env't Rep.Cas. (BNA) 1393 (D.R.I.1984). *See* Plaintiffs' Ex. 1, para. 19, at 23–24 (affidavit of Bruce J. Terris). Therein, plaintiffs were proponents of the position that citizen suits should be allowed to seek penalties for past Clean Water Act violations. Those hours will be disallowed since they are not part of the instant case, are not authorized by statute, and were not even litigated in this circuit. Defendant Monsanto should not be made to pay fees for plaintiffs' unilateral decision to intervene in matters extrinsic to this litigation for the purpose of improving their position vis-a-vis all twenty-six of their Clean Water Act claims. Moreover, it is impossible to determine with any certainty what, if any, effect plaintiffs' amici curiae briefs had upon the decision of the Supreme Court in *Gwaltney of Smithfield, Ltd., v. Chesapeake Bay Foundation*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). Theoretically, if entitled to any fees for such amici curiae briefs, application for the same should be made in the cases where the briefs were filed.

### (c) *Plaintiffs' Travel Time Claims*

Although not explicitly set forth in plaintiffs' Summary of Fees and Expenses, plaintiffs' counsel have included in their proposed lodestar figure numerous hours inevitably and foreseeably spent travelling between the Terris firm's Washington, D.C. office and Camden, Trenton, and/or Philadelphia for court appearances, settlement negotiation meetings, and other activities related to this litigation. *See generally* Plaintiffs' Ex. 5. *See also* Defendant's Ex. 49, at 22 (listing Terris firm's travel time claims). As best as can be determined from the Terris firm's time slips, which are often illegible and/or missing their "classification codes", approximately 112.25 hours of such travel was logged for which the Terris firm claims a right to attorney's fees at the full hourly rate during all travel time. I conclude that amount should be modified.

■ Plaintiffs are entitled to retain whatever counsel they desire so long as they comply with the relevant Federal and Local Rules of Civil Procedure; but penalizing the defendant for plaintiffs' choice of distant counsel is a separate matter.

In *Danny Kresky Enterprises Corp. v. Magid*, 716 F.2d 215 (3d Cir.1983), the district court considered plaintiff's request for compensation for its attorney's travel time from Philadelphia, where counsel worked, to the Pittsburgh venue of the trial. The district court eliminated most of the plaintiff's attorney's travel time claim stating that:

> [P]laintiff was fully aware of the fact that this litigation would take place in Pittsburgh. Despite this, plaintiff chose to secure out-of-town counsel, knowing that capable attorneys were present in Pittsburgh, who could have handled this case. The Court does not believe it fair to impose these travel costs upon defendants; rather, the plaintiff should bear these costs.

*Id.* at 217–18. The Third Circuit, however, directed the district court to reinstate the deducted travel time, mainly because it was "not an appropriate case to fault plaintiff for selecting a counsel from outside the

---

**6.** Plaintiffs' Ex. 4, at 18–19. Due to the manner in which plaintiffs' counsel present their claimed hours, *e.g.*, "2.17", "15.96", it has been necessary in some instances to round out figures. Similarly, monetary figures have been rounded to the nearest amount when necessary.

These figures may not be precise down to the last second and penny but until such time as the Court of Appeals deems it appropriate for Monsanto to assume the cost of an accountant to make more exacting calculations, some approximations h..ve to be made.

city of trial. *Plaintiff's counsel was from the same state, not from across the country,* and under Pennsylvania rules is free to practice throughout the state." *Id.* at 218 (emphasis added).

In contrast, the instant case presents circumstances warranting modification of the Terris firm's travel time from Washington, D.C. to Camden, Trenton, and/or Philadelphia. Plaintiffs have made no showing that they were unable to secure qualified counsel within the District of New Jersey. To the contrary, defendant's submissions establish that qualified south New Jersey attorneys could have successfully handled the case. Moreover, under Local Rule 4 of the District Court of New Jersey, the Terris firm was not entitled to practice in New Jersey absent retention of local counsel at the time this case was initiated.

■ The Terris firm's claim for attorney travel time will therefore be modified. Since plaintiffs were probably entitled under the *Magid* decision to retain counsel from anywhere in New Jersey, including the northern portion of the state, and be fully recompensed for reasonable travel time incurred thereby, it follows that they are entitled to that portion of time spent by their counsel which would putatively have been spent travelling within New Jersey. This action was filed in Camden, New Jersey, which would have been the trial venue had this case not been specially transferred for trial to Philadelphia. Thus, Camden should serve as the central point of reference in calculating plaintiffs' counsel's reasonable attorney travel times.

Newark, New Jersey, is 84 miles from Camden, and Camden is 134 miles from Washington, D.C. *See generally* Rand McNally, *Road Atlas of the United States* (1985). The distance between Camden and Newark is therefore approximately .625 of that between Camden and Washington, D.C. On that basis, I find a reduction of the Terris firm's claim of 112.25 hours of travel time by one-third, or 37 hours to be

appropriate, although this is slightly less of a reduction than a direct proportional reduction.[7] Also, some of the travel time thus allowed may have been for an excessive number of attorneys travelling to a deposition. There is no way to make precise calculations as to all of these variables without requiring further submissions increasing attorney time, and thus fees, out of all proportion to what is reasonable.

### (d) *Educational Time of Ellen K. Wayne on Eve of Trial*

■ Defendant Monsanto avers that 175.25 hours of attorney time spent by Ms. Wayne for "Trial Preparation and Strategy Discussions for January 1988 Trial" should be disallowed inasmuch as those hours were only necessary because of the departure of Mr. Sunderland from the Terris firm. Defendant's Brief at 35–36. Plaintiffs respond that (i) they are entitled to all fees which they would ordinarily bill to a client, including educational time of new counsel; (ii) it is foreseeable that counsel will change in the course of lengthy litigation and, therefore, it is reasonable to charge for the educational time of new counsel; and (iii) defense counsel's argument is disingenuous because they billed Monsanto for essentially the same thing. *See* Plaintiffs' Supp. Brief at 28–29.

Plaintiffs' arguments are not convincing for the following reasons. First, as stated by the United States Supreme Court in *Delaware Valley I* fee-shifting "statutes were not designed as a form of economic relief to improve the financial lot of attorneys, *nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client."* 478 U.S. at 565, 106 S.Ct. at 3098 (emphasis added). The mere fact that the Terris firm might ordinarily bill such expenses to a fee-paying client is not dispositive of the issue of whether such claim is reasonable pursuant to the fee-shifting statute.

---

**7.** Newark is, of course, not the most distant point within New Jersey from Camden, but it is the most distant likely city to obtain competent counsel willing to handle a case of this type. Also, distance does not always vary in exact proportion to travel time. Again, certain approximations must be made unless the task is made so complex that no reasonable fee could be determined.

Second, the Terris firm's "foreseeability" argument is similarly without merit, or rather a "two-edged sword" applying equally to themselves. If it is foreseeable that personnel changes will occur in the course of lengthy litigation, it appears equally reasonable that counsel should be prepared to assume responsibility for the necessary educational time themselves, which was neither the "fault" of the client nor opposing counsel.[8]

Third, defense counsel's billing practices are irrelevant to the issue of whether plaintiffs' counsel is entitled to payment for Ms. Wayne's educational time. That Monsanto may have paid to have an attorney "educated" as to this litigation has no bearing on whether Monsanto should pay for the "education" of plaintiffs' counsel.

Fourth, neither the purposes of ensuring that plaintiffs are able to retain competent counsel or the enhancement of enforcement of important federal interests require, in my view, compensating one of *three* partners present in court every day for her education on the eve of trial. A 50% reduction in the hours claimed by plaintiffs' counsel for the educational time of Ms. Wayne will thus be made, and 87 hours will be deducted from the Terris firm's claim of attorney hours.

### (e) *Pre–Notice of Intent to Sue Hours*

■ The Terris firm requests compensation for approximately one hour of attorney time, and one hour of paralegal time apparently spent researching EPA files from which they ultimately developed notices of intent to sue in this and other cases. *See* Plaintiffs' Ex. 1, paras. 2, 14, at 1–3, 23–24. I note that Judge Brown recently addressed a similar claim in *SPIRG v. Anchor Thread,* No. 84–320, slip op. at 4–5 (D.N.J. May 13, 1988). I agree with Judge Brown that "[p]re-notice of intent to sue activity is analogous to investigative work and as such, is not compensable." *Id.* at 5. In cases under the Clean Water Act, the statutorily mandated "Notice of

Intent to Sue" constitutes the beginning of the litigation in much the same way that the filing of a complaint constitutes the beginning of most other cases. *Id.* One attorney hour and one paralegal hour will therefore be deducted from the Terris firm's lodestar.

In contrast to *Anchor Thread,* however, the hours spent on drafting the complaint are readily identifiable, appear reasonable, and will be allowed in full. *See* Plaintiffs' Ex. 4, at 2.

### (f) *Hours Claimed by Trial Lawyers for Public Justice*

■ The figure of 13.91 hours claimed for Trial Lawyers for Public Justice (TLPJ), Plaintiffs' Ex. 1, para. 9, at 9; Plaintiffs' Ex. 4, at 2, 4) will be disallowed in full. TLPJ was not a party to this action and filed no notice of appearance on behalf of any party in this matter. Moreover, the hours requested by TLPJ fall into the category of hours "allocated to this case from the time billed generally to all of the [Clean] Water Act citizen suits which plaintiffs are litigating," *see* Plaintiffs' Ex. 4, at 2, *see also id.* at 1 n. 1, which as noted previously herein I do not find appropriate or necessary, nor properly segregated.

### (g) *Claim of Ms. Kathleen Butler*

Ms. Butler, who was apparently serving as co-counsel for SPIRG, has submitted through the Terris firm a claim for 19 *Monsanto* specific hours. Plaintiffs' Ex. 4, at 35. The 19 hour figure is derived from Ms. Butler's description of her time spent on this and other cases which is set forth in plaintiffs' exhibit 11. The 19 hour time for the work described appears to be reasonable and will be allowed in full.

### (h) *Fees for Mr. Edward Lloyd's Time*

■ In addition to their own fees, the Terris firm requests fees for 17.83 hours expended by Mr. Edward Lloyd. Plaintiffs' Ex. 4, at 35. Mr. Lloyd is identified

---

**8.** I believe this position is also mandated to avoid the award of an undue windfall and the abuse of fee-shifting provisions by unscrupulous counsel. Although I do not suggest plaintiffs' counsel engaged in any such activity, it is not difficult to envision a situation where a large unscrupulous law firm could, by shifting personnel assigned to a case, increase their billable hours virtually ad infinitum.

in Mr. Terris's affidavit, as "[SPIRG's] General Counsel." Plaintiffs' Ex. 1, para. 13, at 8–9. Plaintiffs claim Mr. Lloyd should be compensated because his hours were spent "during the trial of this case in order to have exhibits authenticated." *Id.* at 9.

Defendants strongly urge this court to award Mr. Lloyd nothing on two grounds. First, because he did not testify at trial and defense counsel never had any contact with him regarding this case. *See* Defendant's Ex. 1, para. 17, at 10. Second, because Mr. Lloyd did "nothing more than make telephone calls, travel to pick up documents, and review documents for authentication at trial [and] [i]n essence ... appeared to function as a messenger · or paralegal." *See* Defendant's Brief at 38–39. Third, defendant argues that as in-house counsel to SPIRG, Mr. Lloyd was merely a client of the Terris firm and is therefore not entitled to attorney's fees.

A review of relevant caselaw shows defendant's third argument to be meritorious. The most recent statement by the Third Circuit on the issue of whether in-house counsel is entitled to fees pursuant to a fee-shifting statute is found in *Delaware Valley Citizens' Council v. Pennsylvania,* 762 F.2d 272 (3d Cir.1985), *rev'd on other grounds,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). Therein, the Third Circuit explicitly stated that "[a]s an initial matter, we agree ... that in-house counsel is not entitled to a court award of attorneys fees for doing client work, *such as furnishing information or documents to outside counsel." Id.* at 278 (emphasis added). The work Mr. Lloyd performed, according to Mr. Terris's affidavit, was of the precise type that the Third Circuit condemned as inappropriate for the award of

counsel's fees.[9] Mr. Lloyd's 17.83 hours will be deleted from those hours requested by plaintiffs for attorney's fees.

### (i) *Hours Claimed for Mr. Walter Curtis*

Plaintiffs' claim of 6 hours for Mr. Walter Curtis, who was apparently an associate of their local counsel, Mr. Michael Gordon, will be disallowed. After a thorough review of plaintiffs' submissions, *see, e.g.,* Plaintiffs' Ex. 1, paras. 12, 26, at 8, 30; Plaintiffs' Ex. 40, I can find no evidence or affidavit indicating what Mr. Curtis did specifically relating to the *Monsanto* case, nor his experience level at the time he allegedly performed such work. Without so much as a copy of his resume, I am unable to extrapolate a reasonable fee and therefore disallow his claim. *See Ohio–Sealy Mattress,* 776 F.2d at 656 (affirming fee reduction where fee petition was "vague, inconsistent and lacking adequate identification of hours").

In summary, the following specific hours will be subtracted from the Terris firm's lodestar:[10]

| Terris, Edgecombe, Hecker & Wayne Attorneys' Hours | | Hours |
|---|---|---|
| Overstaffing and Deposition Hours: Depositions of Plaintiffs' Own Witnesses | 53 | |
| Depositions of Defendant's Fact and Expert Witnesses | 55 | |
| Overstaffing at Trial | 120 | |
| Total | | 228 |
| Amici Curiae Brief Hours | | 39 |
| Travel Time | | 37 |
| Educational Time of Ms. Ellen Wayne | | 87 |
| Pre–Notice of Intent to Sue Hours | | 1 |
| TOTAL | | 392 |

| Paralegal/Law Clerk Hours | |
|---|---|
| Pre–Notice of Intent to Sue Hours | 1 |

**9.** In direct contrast to the in-house counsel in *Delaware Valley,* who was ultimately awarded fees by the Third Circuit, Mr. Lloyd never filed a notice of appearance with the court. Moreover, there is no evidence showing Mr. Loyd "performed a large part of the activity" in this matter for which counsels' fees are sought. *See Delaware Valley,* 762 F.2d at 278.

**10.** I have considered the efficacy of subtracting the general and specific reductions from the

reasonable attorneys' hours' prong of the lodestar, and concluded that to do so would be of uncertain accuracy in view of the number of attorneys involved, the applicability of historical rates, and impossibility of applying specific reductions to individual attorney's hours in many instances. *See supra,* at note 4. For a complete discussion of the methodology used for making the general and specific reductions, see *infra* at 620.

The separate claims of Trial Lawyers for Public Justice for 13.91 hours, Mr. Edward Lloyd for 17.83 hours, and Mr. Walter Curtis for 6 hours are denied *in toto*. Ms. Kathleen Butler's claim for 19 hours, and Mr. Michael Gordon's claim for 48 hours, Plaintiffs' Ex. 4, at 35, will be granted free of the deductions applicable to the Terris firm since there is no evidence that those attorneys were responsible for the activities warranting the specific modifications.

### 3. Reasonable Hourly Rate

#### (a) *Market Rate Rule*

To compute the lodestar, the next issue which must be determined is the "reasonable hourly rate" by which plaintiffs' counsel should be compensated. *See Delaware Valley I*, 478 U.S. at 563, 106 S.Ct. at 3097 (citing *Lindy I*, 487 F.2d at 167); *see also SPIRG v. AT & T*, 842 F.2d at 1436; *Fine Paper*, 751 F.2d 562; *Lindy II*, 540 F.2d at 102. In *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Supreme Court held that a fee award is to be calculated "according to the *prevailing market rates in the relevant community*, regardless of whether plaintiff is represented by private or nonprofit counsel." *Id.* at 895, 104 S.Ct. at 1547 (construing 42 U.S.C. § 1988) (emphasis added).

In the recent case of *SPIRG v. AT & T*, in which the Terris firm similarly represented plaintiffs, the Third Circuit was confronted with the question of how best to effectuate and apply the *Blum* holding to a "unique genre of attorneys, who operate for profit but essentially rely on fee shifting statutes." *Id.* at 1438. After evaluating four distinct approaches, the court adopted the "community market rate" rule for determining fee awards pursuant to the provisions of the Clean Water Act stating:

> [U]nder the facts of this case, involving a for-profit public interest law firm [i.e., the Terris firm] that has an artificially low billing rate, the community billing rate charged by attorneys of equivalent skill and experience performing work of

similar complexity, rather than the firm's billing rate, is the appropriate hourly rate for computing the lodestar.

*Id.* at 1450.

Attorney's fees in this case should thus be determined by applying the market rate in the relevant community. The problem which arises, however, is the location and area of the "relevant community." Plaintiffs argue that pursuant to *SPIRG v. AT & T* the relevant community is where they do business, *i.e.*, Washington, D.C. Defendant strongly disputes application of Washington, D.C. rates and argues that the relevant community and appropriate rate should be that of the forum, southern New Jersey.

*SPIRG v. AT & T* is unfortunately not dispositive on this matter. While the court determined, for the purposes of that case, that the "relevant community" was Washington, D.C., it did *not* hold the location of the prevailing party's law firm to be determinative of the relevant community. To the contrary, the Third Circuit expressly declined to address that very issue in the case, stating in a significant footnote that "[t]his opinion should *not* be construed ... as endorsing a fee based upon an outside market rate *at variance* with the market rate *of the site of the litigation*, for we do not reach that issue." 842 F.2d at 1442 n. 4 (emphasis added). Thus, the *SPIRG v. AT & T* opinion implicitly, if not explicitly, supports the view that the "relative community" is that of southern New Jersey.

The court's decision to apply Washington, D.C. rates in *SPIRG v. AT & T* can be explained by four major factual distinctions from the instant case. First, both plaintiffs and defendants were represented by Washington, D.C. law firms. Second, the case was "briefed and argued based on the D.C. market." *Id.* Third, the court could find "no reasonable basis for believing any differential existed between the two metropolitan markets" because the district court, which sat in Newark, New Jersey, had not been provided with data as to market rates prevailing in northern New Jersey. Fourth, and perhaps most significantly, there was apparently no objection made by

the defendant to the plaintiffs' Washington, D.C. "market rate" proofs. *See id.*

■ I have therefore concluded that, in the absence of binding precedent to the contrary, the relevant community for purposes of computing the reasonable hourly rate prong of the lodestar is that of southern New Jersey. In support of my decision, I note that in 1986 the Third Circuit Task Force on Court Awarded Attorney Fees (Task Force) was convened to study "a number of difficulties [which] have been encountered in applying the *Lindy* [*I* ] [lodestar] formulation." Report of the Third Circuit Task Force on Court Awarded Attorney Fees, 108 F.R.D. 237, 238 (1986) (Task Force Report).

The Task Force Report addressed the issue of standardization of hourly rates in the award of attorney's fees stating that "[i]n establishing a standardized fee schedule the court will encounter the problem of selecting hourly rates for visiting lawyers from other parts of the country litigating in its forum." *Id.* at 261. After reviewing the current practices of the various circuits, the Task Force "concluded that the best rule is the 'forum rate' rule."[11] The Task Force further advised that "[d]eviation from this rule should be permitted only when the need for the special expertise of counsel from a distant district is shown or when local counsel are unwilling to handle the case." *Id.*

Plaintiffs in the instant action have provided no evidence to establish a lack of New Jersey counsel capable of litigating this action, or that New Jersey law firms were unwilling to handle the case. I further note that the "special expertise," if any, which the Terris firm claims to have gained, *see* Plaintiffs' Brief at 15, as a result of litigating twenty-six substantially similar Clean Water Act cases could not have accrued until *after* the decision had already been made by the plaintiffs to retain them, *i.e.*, "after the fact." Deviation from the forum rate rule is thus unwarranted.

The present case is precisely the type of case in which application of the forum rate rule is not only appropriate but compelling. Plaintiffs voluntarily chose both the venue of the action and the law firm they wished to represent them therein. There exists no evidence whatsoever indicating that the nature of this litigation was beyond the expertise of New Jersey lawyers. Nor do I believe plaintiffs could sustain that burden. In truth, the case neither prospectively nor retrospectively viewed was particularly difficult, complex, or requiring of specialized expertise. Plaintiffs should not be penalized for retaining counsel of their choice, but neither should they be permitted to impose additional costs on defendants for plaintiffs' decision to go outside the district when ample competent local counsel were available.

A blanket acceptance of plaintiffs' contention that the relevant market is wherever their counsel's law firm is located provides for a slippery slope indeed. Without so much as a showing of necessity as contemplated by the Task Force, *see* Task Force Report, at 261, plaintiffs would be free not only to retain counsel from literally anywhere in the United States, but arguably the entire world, thereafter subjecting the defendant to the foreign market rate however unreasonable or extravagant by the forum's standards. For example, should a hypothetical plaintiff be allowed to retain counsel in Hawaii, Alaska, or the West Coast of the United States and thereafter bill the innumerable hours of flight time to a losing defendant at the hourly rates charged by attorneys practicing in such distant locations? The forum rate rule is the most sensible method of avoid-

---

**11.** Task Force Report, at 261. Under the forum rate rule the Task Force stated that "an out-of-town lawyer would receive not the hourly rate prescribed by his district but rather the hourly rate prevailing in the forum in which the litigation is lodged." *Id.* The Task Force did caution that the forum rate rule was "contrary to current Third Circuit practice." *Id.* & n. 73 (citing *Cunningham v. City of McKeesport,* 753 F.2d 262 (1985); *Fine Paper,* 751 F.2d at 590–91). That caveat, however, was made prior to the more recent case of *SPIRG v. AT & T,* which I conclude supports the application of the "market rate at the sight of the litigation." *See* 842 F.2d at 1442 n. 4.

ing such excesses, while allowing parties to select competent counsel of their choice.

### (b) *Application of Southern New Jersey Rates*

The community market rate is to be established by "affidavits demonstrating 'that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill expertise and reputation.'" *SPIRG v. AT & T*, 842 F.2d at 1448 (quoting *Blum*, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11). Defendant has submitted a total of nineteen affidavits of attorneys practicing this type of litigation in the southern New Jersey area setting forth the standard hourly rates charged by their firms. Defendants Ex. 19–34, 58–60. Additionally, defendant has submitted a summary, *see* Defendant's Ex. 61, of the southern New Jersey rate data by attorney experience level for each year of this litigation. That summary further amplifies defense exhibit 35 by incorporating the additional rate information contained in defense exhibits 58–60. I am satisfied after reviewing the defendant's exhibits that they satisfactorily set forth the rates historically and currently charged by firms engaged in like litigation in the southern New Jersey area.

Plaintiffs chose not to submit any specific counter evidence challenging the accuracy of defendant's rate data for the southern New Jersey community. *See National Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1326 (D.C.Cir. 1982) ("Once the fee applicant has provided support for the requested rate, the burden falls on the Government to go forward with evidence that the rate is erroneous. And when the Government attempts to rebut the case for a requested rate, it must do so by equally specific countervailing evidence."). Instead, plaintiffs merely argue that gathering such evidence "would be a massive undertaking." [12] Plaintiffs' Supp. Brief at 31.

■ Although plaintiffs have had the opportunity since June 1988 to gather and submit counter affidavits, plaintiffs request yet more time to do so in the event I rule that southern New Jersey rates are held applicable. As Judge Brown stated in *SPIRG v. Anchor Thread* when addressing a similar request by the Terris firm:

> This Court's inquiry into the proper fee to be awarded to plaintiffs has dwarfed the case in chief ... plaintiffs have chosen "to keep the meter running" ... and expect this Court to conduct a thorough analysis of each of their applications. Were this Court to allow [further submissions] it may well be that there would be no end to this litigation.... Enough is enough.

*SPIRG v. Anchor Thread*, No. 84–320, slip op. at 6 (D.N.J. September 9, 1988) (Memorandum Opinion and Order). This court too has heard enough. Plaintiffs' request for additional submissions will be denied. *See Blum*, 465 U.S. at 892 n. 5, 104 S.Ct. at 1545 n. 5 (petitioner waived right to challenge reasonableness of prevailing market rate where it failed to submit any evidence challenging the calculation in the district court).

■ After reviewing defendant's exhibits and affidavits submitted on this issue, *see* Defendant's Ex. 19–35, 58–61, I choose not to apply defendant's recommended "minimum New Jersey rates" which would decrease plaintiffs' lodestar by 57%. *See* Defendant's Supp. Brief at 13 & n. *. Defendant's 57% reduction is predicated upon use of the "billing rate rule" as set forth in *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.Cir.1984), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985), which the Third Circuit evaluated and expressly rejected in favor of the market rate rule. *See SPIRG v. AT & T*, 842 F.2d at 1443–45, 1448. Instead, I believe applying average southern New Jersey rates appropriately balances the dual interests of attracting competent counsel while avoiding an undue windfall. Applying average

---

12. I find this excuse singularly unconvincing inasmuch as had plaintiffs directed more of their time and energy to collecting southern New Jersey rate data rather than analyzing defense counsel's time records over the past several months, their time would have been better spent.

southern New Jersey rates will reduce the reasonable rate prong of plaintiffs' attorneys' lodestar by approximately 37%. *See* Defendant's Supp. Brief at 13 & n. **; *see also* Defendant's Ex. 61 (summarizing range of rates, minimum rate and average rate for each year and experience level of plaintiffs' counsel); Defendant's Ex. 38 (attached hereto as Appendix A).

#### 4. The Lodestar

The Terris firm claims 3,277 Monsanto specific hours for which they seek compensation. *See* Appendix A (not including paralegal/law clerk hours and local counsel). Multiplying the individual Terris attorney's hourly fees based on historical southern New Jersey rates as set forth in Appendix A by plaintiffs' number of hours claimed, yields a figure of $291,681.29 in attorney's fees, exclusive of modification. *See* Appendix A (construing Plaintiffs' Ex. 4).

The hourly rate for the specific modifications is based on an average southern New Jersey rate over the entire time of this litigation. This is not only the most practical way to apply the modifications, but may be the only way such a reduction can be effectuated. Moreover, in cases involving voluminous fee applications, the "courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir.1983). I have therefore calculated the "average hourly rate"[13] to which the Terris firm would be entitled over the course of this litigation as $87.00 an hour. That figure takes into consideration both years of experience and average historical rates charged by southern New Jersey lawyers.

Against that background, first the specific deductions will be taken out. As summarized *supra,* page 616 of this opinion, those reductions total 392 hours. Multiplying 392 by the $87.00 hourly rate yields a reduction of $34,104.00 to the Terris firm's lodestar of $291,681.29 based on historical southern New Jersey rates. *See* Appendix A. Thus reduced, the lodestar amount for the Terris firm is $257,577.29.

Thereafter, the general twenty percent deduction will be applied to the reduced lodestar. Twenty percent of $257,577.29 is $51,515.46. Reducing the (specifically) reduced lodestar by twenty percent, thus yields a total attorney's fees lodestar for the Terris firm of $206,061.83.

That same formula has similarly been applied to the Terris firm's claim for 563.75 paralegal/law clerk hours, totalling $20,444.38 utilizing historical southern New Jersey rates. *See* Appendix A. The average rate for such employees in southern New Jersey law firms over the course of this litigation I calculate to be $45 an hour. Deducting the one hour specific time, *see supra* at 616, at $45 per hour, results in a total of $19,399.38. From that is deducted the twenty percent general reduction, leaving a net for paralegal services of $15,519.50. In sum, plaintiffs' counsel are entitled to reasonable attorney's fees as follows:

| Terris, Edgecombe, Hecker & Wayne | | |
| --- | --- | --- |
| Attorneys | | $206,061.83 |
| Paralegal | | 15,519.50 |
| | TOTAL | $221,581.33 |

| | | |
| --- | --- | --- |
| Ms. Butler[14] | | $ 1,140.00 |
| Mr. Gordon | | $ 3,301.01 |

#### D. *Delay Enhancement*

Plaintiffs' counsel notes that they "have not received any compensation for the legal services they have provided for over five

---

**13.** The court recognizes that this amount may at first glance appear somewhat low. It is, however, a general average, based on southern New Jersey rates, year by year, over 38 historical periods (as determined by years of litigation and experience level) which yielded an average of approximately $87.00 an hour. *See* Appendix A (construing Plaintiffs' Ex. 4, at 34–35; Defendant's Ex. 38). I note that to the extent this average appears low, it favors the prevailing plaintiffs' attorneys since it is being used only for *reduction* of the claimed fee.

**14.** I have determined, after a review of the relevant evidence, that neither Ms. Butler nor Mr. Gordon should be subject to the general or specific deductions since nothing suggests they were responsible for activities warranting reduction.

years "and therefore request that the court order an upward "delay enhancement" to compensate them for their alleged losses. Plaintiffs' Brief at 26–27. Defendant objects and claims a delay enhancement is not appropriate in this case.

The Third Circuit has recognized that delay constitutes an appropriate reason for enhancement of the lodestar. *SPIRG v. AT & T*, 842 F.2d at 1453 (citing *Black Grievance Comm. v. Philadelphia Electric Co.*, 802 F.2d 648, 655–56 (3d Cir.1986), *vacated and remanded*, 483 U.S. 1015, 107 S.Ct. 3255, 97 L.Ed.2d 754 (1987); *Fine Paper*, 751 F.2d at 588.) Therein the court of appeals explained the policy behind compensating plaintiffs for delay stating: " '[P]ayment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime.' " *Id.* (citations omitted).

While plaintiffs' entitlement to a "[d]elay compensation does not depend on the type of case or quality of representation," it nevertheless requires the presentation of " 'carefully developed evidence of the costs to plaintiffs of receiving the delayed payment for services.' " *Id.* (citing *Institutionalized Juveniles*, 758 F.2d at 923). Plaintiffs have the burden to document their need for a delay enhancement. *See id.* (citing 758 F.2d at 923–24). For the following reasons, I do not believe plaintiffs have met that burden and their request for a delay enhancement will be denied. *See Institutionalized Juveniles*, 758 F.2d at 922 (citing *Fine Paper*, 751 F.2d at 601 (Becker, J., concurring) ("The decision to award a multiplier for delay in payment and the amount of such a multiplier are determinations within the discretion of the district court.").

▉▉▉ First, apparently having failed in *SPIRG v. AT & T* to provide sufficient "carefully developed evidence" of the costs of their delayed receipt of payment, *see* 842

F.2d at 1454, this time the plaintiffs have submitted prime rate interest figures, CD interest rate figures, and various methods of calculating a delay adjustment. *See* Plaintiffs' Brief at 23–29. Their voluminous submissions, however, do not alter the basic fact that an upward adjustment for delay is unnecessary to produce a "reasonable" fee award in this case. *See Blum*, 465 U.S. at 897, 104 S.Ct. at 1548 (stating product of hours reasonably expended times reasonable hourly rate is "*presumed* to be the reasonable fee.") (emphasis added).

Second, as defendant pointedly notes, in computing their "losses", plaintiffs completely ignore the significant tax impact of receiving all their fees subsequent to 1987. Prior to 1987, the value of a payment was not substantially affected by the year in which it was received because federal income tax rates on earned income had not deviated substantially during the previous decade. Currently, however, with tax rates reduced from a top rate of approximately 50% of total income (applicable to years 1983 through 1986) to a top rate of approximately 28% of total income [15] in 1988, *see* Tax Reform Act of 1986, Pub.L. No. 99–514 § 101(a) (1986) (amending § 1 of the IRS Code), the income tax savings accruing to plaintiffs from the deferral of payments to 1988 should substantially compensate for, if not exceed, the costs to plaintiffs of not having received that income prior to 1987. Defendant's exhibits 52–56 amply support its argument in this regard, and I agree that the plaintiffs have already received a unique but real benefit from the deferral of compensation.[16] *See* Defendant's Supp. Brief at 51–54.

Third, regardless of the tax effects, in *SPIRG v. AT & T*, the Third Circuit found an enhancement unwarranted because the Terris firm had failed to sustain the burden

---

**15.** There is a phase-out of a 15% surtax rate on certain income that allows the maximum rate on some income to be 33%.

**16.** Although the tax benefits are, as between plaintiffs and defendant purely fortuitous, which neither party could foretell or control, there is no reason that I can perceive why

plaintiffs should be granted additional compensation for a delay that inured to their financial advantage. I further note plaintiffs did not contest this issue in their supplemental brief in reply to defendant's brief in opposition to plaintiffs' application for an award of litigation costs.

of documenting the need for a delay enhancement, 842 F.2d at 1453–54. While the Terris firm has, this time, submitted to the court information regarding prime and CD interest rate figures for attorney's services, it is difficult for me to perceive any tangible difference between plaintiffs' alleged "need" for an enhancement in this case and *SPIRG v. AT & T.* A comparison of plaintiffs' claims is illustrative. In *SPIRG v. AT & T,* plaintiffs maintained that

> there has been a considerable delay in the receipt of payment for services rendered. If plaintiffs were fee-paying clients, counsel would have received payment for their services every month. However, since plaintiffs are not paying clients, counsel have foregone payment for their services and even reimbursement for their out-of-pocket expenses for approximately three years.

*Id.* at 1454 (quoting Reply Brief for Appellant/Cross–Appellee (Bell) at 27 n. *). In the instant case, plaintiffs reiterate their perceived need for a delay adjustment in virtually the same language [17] as that rejected by the Third Circuit as "very primitive evidence." *Id.* Plaintiffs' only new averment in this case is that they "have suffered substantial losses and, as a result, have had to borrow substantial sums of money to cover them." Plaintiffs' Brief at 27.

That additional summary statement still does not adequately document or explain why the lodestar amount does not reflect an adequate reasonable fee. Moreover, it is impossible to determine on the evidence now before me (1) how many loans were taken out; (2) the amount and interest rate of those loans; and most importantly (3) precisely how and to what extent defendant Monsanto, from among the twenty-six Clean Water Act defendants, is responsible for the Terris firm's borrowing. Plaintiffs have thus failed to meet their burden of showing their entitlement for a delay enhancement. *See SPIRG v. AT & T,* 842

F.2d at 1453 (citing *Institutionalized Juveniles,* 758 F.2d at 923–24). Having determined that plaintiffs are not entitled to the delay enhancement they have requested, I need not address the applicability of plaintiffs' suggested "averaging" or "current rates" methodologies.

For the foregoing reasons, plaintiffs' request for a delay enhancement to the lodestar amount will be denied.

Plaintiffs' request for a delay enhancement for litigation expenses will similarly be denied since they have not cited any authority supporting the award of such an enhancement. Additionally, this aspect of plaintiffs' proposed adjustment is seemingly inconsistent with the approach of the court in *Weiss v. York Hospital,* 628 F.Supp. 1392 (M.D.Pa.1986). In *Weiss,* the court acknowledged that during the pendency of the litigation plaintiffs' counsel incurred such expenditures as payroll, postage, printing, experts' fees, travel and costs of transcripts. *Id.* at 1414. However, the court applied its interest calculations to the historical lodestar value of the *services rendered;* it did not apply any interest to its separate award of costs. The court noted that it had the discretion to "increase the lodestar to compensate counsel for the delayed payment of *fees* " only. *See id.* at 1416 (citing *Institutionalized Juveniles,* 758 F.2d at 922; *Lindy II,* 540 F.2d at 117).

### E. *Reasonable Litigation Expenses*

In addition to reasonable attorneys' fees, plaintiffs request an award of $112,894.10 for their "out-of-pocket" litigation expenses, including expert witness fees. Plaintiffs' Brief at 22–23. That figure represents the amount plaintiffs claim they incurred in out-of-pocket litigation expenses in the following categories: (1) photocopying and binding; (2) postage/overnight delivery charges; (3) telephone calls; (4) travel; (5) courier services and secretarial overtime; (6) documents; (7) expert wit-

---

**17.** Plaintiffs' present fee application states: "Plaintiffs' counsel have not received any compensation for the legal services they have provided for over five years.... They have in-

curred both overhead costs and direct litigation costs without the benefit of payment for their services or reimbursement of their out-of-pocket litigation expenses." Plaintiffs' Brief at 26–27.

ness fees; (8) transcripts, deposition witness fees, filing fees and miscellaneous. I will address each of these categories.

### (1) Photocopying and Binding

■ Plaintiffs claim a total of $10,483.00 for photocopying and binding. Plaintiffs' Ex. 4, at 42. While photocopying may properly be considered subject to reimbursement as a "cost of litigation", *see Anchor Thread*, slip op. at 15, 1988 WL 49177 (May 15, 1988), only 10% ($1,048.30) of plaintiffs' claim will be allowed. It is impossible to determine from the vague evidence submitted what percentage of "June Xerox Water NJ" or "May Xerox Water NJ",[18] for example, is allocated solely to this case, and whether such expenses were reasonably incurred, or incurred solely for the convenience of the plaintiffs. *See id.*

### (2) Postage/Overnight Delivery Charges

■ Plaintiffs claim to have spent $1,873.00 on "postage". Plaintiffs' Ex. 4, at 42. However, use of the term "postage" is deceptive, since that amount includes substantial amounts attributable to their grossly excessive use of Federal Express for the delivery of documents. I should again note that the question before me is not merely whether this is an expense which plaintiffs would ordinarily bill a client, but whether it is *reasonable*. The use of an overnight delivery service is ordinarily attributable to one of three reasons; first, to meet a filing date, which normally could have been avoided by attending to the task earlier; second, a sudden emergency, of which there is no evidence; third, for the convenience of the clients or counsel. None of those reasons is sufficient to categorize such expenses as "reasonable." I find the same to be true for "FAX" charges.

However, plaintiffs are entitled to some reimbursement since at least, in most instances, I am able to determine Monsanto-specific expenses. *See generally* Plain-

tiffs' Ex. 8, at 31–66. Thus, I will make the following modification. Federal Express[19] presently charges $20.25 for an overnight delivery of one pound. The United States post office presently charges $2.40, or approximately 12% that of Federal Express, for first class mail of the same weight. Plaintiffs will thus be awarded 12% of their claimed postage expenses or $224.76.

### (3) Telephone Calls

Plaintiffs claim $1,081.03 in telephone calls connected to this litigation. Plaintiffs' Ex. 4, at 42. These charges appear to be both specific and reasonable and will be allowed. I find defendant's argument that "plaintiffs' costs for telephone calls ... are necessarily inflated because of plaintiffs' retention of counsel in Washington, D.C." unpersuasive for lack of evidence as to the extent of such additional costs.

### (4) Travel

Plaintiffs claim $10,808.38 for travel-related expenses. For the reasons set forth *supra* at pages 613–14, plaintiffs shall be entitled to two-thirds of their travel related expenses, or $7,205.59.

### (5) Courier Services and Secretarial Overtime

Plaintiffs' claims for the use of courier services and secretarial overtime are $447.35 and $1,074.48 respectively. Plaintiffs have not met their burden of proving to this court that such expenses were essential and necessary, and were not incurred merely for the convenience of plaintiffs' attorneys. *Anchor Thread*, slip op. at 14–15. Plaintiffs' request for these expenses will be denied.

### (6) Documents

Plaintiffs' claim of $134.10 for costs incurred for copies of recent court opinions, technical literature and EPA enforcement policy documents appears to be reasonable and will be allowed.

---

**18.** *See generally* Plaintiffs' Ex. 10, at 6–23A.

**19.** Other companies rates may vary, but Plaintiffs' Exhibit 8 indicates Federal Express was used exclusively by plaintiffs.

**(7) Expert Witness Fees**

Plaintiffs additionally claim $81,197.27 for expert witness fees and expenses. In their brief in opposition to plaintiffs' application for an award of litigation costs, including attorneys' fees and expert witness fees, defendants advance several theories why plaintiffs' claim should be denied. *See* Defendant's Brief at 64–70. Plaintiffs apparently chose not to rebut the defendants contentions in their supplemental brief.

As previously set forth in the opinion and order of March 30, 1988, the court may award costs of litigation in Clean Water Act cases, including "reasonable" expert witness fees if such an award is deemed "appropriate". Opinion and Order at 37 (citing 33 U.S.C. § 1365(d) (1982)). *See also Anchor Thread,* slip op. at 10. Thus, as Judge Brown stated in *Anchor Thread* when addressing this issue, "[t]he question that remains ... is what expert witness fees incurred by plaintiffs should be deemed reasonable and therefore allowed by [the] Court." *Anchor Thread,* slip op. at 10. At least one circuit has interpreted the term "appropriate", as meaning that evidence provided the expert for whom fees are sought "was valuable in establishing a Clean Water Act claim." *Citizens Coordinating Committee on Friendship Heights, Inc. v. WMATA,* 765 F.2d 1169, 1174 (D.C. Cir.1985). I do not believe plaintiffs have fully substantiated their burden of showing their expert witness fees to be either reasonable or appropriate in this litigation and, thus, their expert witness fee claim will be substantially modified.

Plaintiffs hired, and claim fees for Messrs. Martin, Kazmierzack and Kavanaugh as expert witnesses, ostensibly to assist in my determination of the proper amount of civil penalties. Mr. Kazmierzack ultimately did not testify at trial, and I expressly found the "voluminous testimony and evidence" submitted by plaintiffs to persuade me to impose a penalty for all prior and post-complaint violations while "properly submitted, [was] of minor assist-

ance in determining a proper penalty." Opinion at 27.

Plaintiffs urged this court to apply a methodology used by the EPA when it determines "estimated judgment figures" for settlement negotiations in EPA enforcement proceedings, which I found to be virtually worthless, stating:

> There are problems with attempting to use this methodology in this case. First, this is not an EPA enforcement action. Second, this is not a settlement of civil penalties but rather a determination to be adjudicated after a full trial. Third, the witnesses were not employees of EPA, and their assessment of how the EPA would quantify the figures by applying its methodology is at least questionable. Fourth, no witness attempted to utilize the BEN computer program which plaintiffs conceded would be utilized by the EPA. Fifth, Dr. Kavanaugh's calculations were based on various assumptions that at best are subject to serious doubt. Sixth, many of the calculations that were presented in evidence were later corrected or qualified in substantial respects by the witnesses.

*Id.* at 29. I summarized my view of plaintiffs' economic benefit evidence stating that "[a]s a practical matter, ... all of the evidence as to economic benefit [was] of very little, if any, assistance in guiding my discretion in assessing an appropriate penalty." *Id.* at 31–32. Plaintiffs' evidence concerning the "gravity component" presented by Messrs. Schmid and Nguyen I deemed to be "of even less value in determining an appropriate penalty in this case." *Id.* at 32.

■ I conclude that plaintiffs should not recover any fees for experts who were retained to state the obvious, or explain and exemplify abstract theories which were of questionable relevance to the case or assistance in determining an appropriate penalty. Inasmuch as the most substantial evidence as to liability against Monsanto was the defendant's own DMRs,[20] expert

---

**20.** I note plaintiffs' experts also wasted a significant amount of trial time addressing the issue of penalties for pre-complaint violations, an issue I

had already ruled upon before trial. *See* Opinion at 617 ("Despite the pretrial ruling that, for purposes of imposing a penalty in this case,

testimony as to a methodology for determining penalties was wholly unnecessary. *See, e.g., Friends of the Earth v. Eastman Kodak Co.,* 834 F.2d 295, 298 (2d Cir.1987) (affirming district court's downward adjustment of lodestar on basis that "evidence consisted of defendant's own DMRs, which have been held sufficient to entitle a plaintiff to summary judgment."); *ADM Corp. v. Speedmaster Packaging Corp.,* 525 F.2d 662, 665 (3d Cir.1975) (trial court has right to deny costs "where the prevailing party has unduly extended or complicated resolution of the issues."). Plaintiffs' experts were thus of no value in establishing a Clean Water Act claim upon any of the key issues. The concept of awarding plaintiffs' "reasonable expert witness fees" under section 1365(d) does not, in my view, mandate reimbursement to counsel for wasteful expenditures or rewarding them for poorly chosen and ineffectual means of proof.

■ Additionally, plaintiffs have failed to specify the nature of the services rendered by their other experts referenced in their application. For example, plaintiffs' claim for the services of "ICF Incorporated" is solely supported by eight invoices which only vaguely allude to "work performed" during various months. As such it is impossible for this court to determine that such charges were reasonable.

For the foregoing reasons, plaintiffs should not recoup all their claimed expenses for expert witness fees, particularly as to the issues upon which they did not prevail. Under the Supreme Court's decision of *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), it seems appropriate to reduce the claim for expenses by the percentage of time which was consumed by issues upon which plaintiffs did not prevail, which I estimate to be 50%, and a further 10% reduction to account for fees claimed by plaintiffs which were unnecessary, unsubstantiated, or unduly vague, making a total reduction of 60%. Plaintiffs will therefore be entitled to

$32,478.91 in expert witness fees, which in my view is quite generous under the circumstances.

(8) Transcript, Demonstrative Evidence, Deposition Witness Fees, Filing Fees and Miscellaneous

The Terris firm claims a total of $5,795.49 for *Monsanto* expenses under the following categories: transcripts, filing fee, demonstrative evidence, deposition witness fee, and miscellaneous. Plaintiffs' Ex. 4, at 42–43. These expenses appear to be reasonable and will be allowed.

As previously noted, this court rejects the inclusion of "Water–General" and/or "Water–New Jersey" expenses in determining plaintiffs' reasonable attorneys' fees and expenses in this case. Plaintiffs' requests for litigation costs associated with those categories will be denied, since it cannot be determined that they were incurred in connection with this litigation.

5. Expenses of Kathleen Butler and Trial Lawyers for Public Justice

Ms. Kathleen Butler and Trial Lawyers for Public Justice claim $93.59 and $355.89, respectively, in *Monsanto* specific litigation expenses. Those claims arose solely out of counsel's pre-notice of intent to sue activities, and as noted *supra* at 615, are analogous to investigative work and as such will not be compensated in addition to the hours allowed for attorney's fees purposes.

F. *Effect of Recent Third Circuit Decision*

■ It is also noted that the Third Circuit recently affirmed the district court's decision in *SPIRG v. Anchor Thread. See* Nos. 88–5504, 88–5527, 88–5575, 88–5858, 88–5859 (3d Cir. January 24, 1989) [869 F.2d 592 (Table)]. Therein, the court of appeals explicitly held that the district court had not abused its discretion by reducing the Terris firm's lodestar "by a pro rata share of the common time expended

penalties would not be imposed for violations occurring prior to the commencement of this lawsuit, plaintiffs offered voluminous testimony

and evidence seeking to persuade me to impose a penalty for all prior and post-complaint violations.")

on this and 26 other [Clean Water Act] cases." *Id.*, slip op. at 4. The Third Circuit's opinion reinforces the conclusion that such hours should not be allowed in computation of the lodestar. *See infra*, at 611 n. 3, 625.

In a recent unsolicited letter to the court, however, the Terris firm argues that "the decisions in *Anchor Thread* are not applicable in this case because plaintiffs here have produced all the evidence that the Court found lacking in *Anchor Thread*." I disagree. "In *Anchor Thread,* the time billed to each of the general categories and then allocated to that case was identified in a summary of fees and expenses similar to Plaintiffs' Exhibit 4 in this case." Plaintiffs' Ex. 48, para. 27, at 12–13. The only additional submissions made by the Terris firm in this case, compared to *Anchor Thread,* relate solely to the method of apportionment among the Clean Water Act cases. *See id.*, paras. 27–28, at 13–14 (citing Plaintiffs' Ex. 70, 72). The Terris firm has still not provided any evidence which would allow the court "to determine how and to what extent the individual activity in each of the non-specific files is *related to this case.*" *Anchor Thread,* No. 84–320, slip op. at 17 (emphasis added). Plaintiffs' attorneys' fees for work apportioned to this case from the so-called "Water General" and "Water N.J." filed will not be allowed.

## III. CONCLUSION

In determining the appropriate amount of attorneys' fees to be awarded, I first determined what would be an appropriate fee utilizing all of the hours claimed as contained in Appendix A,[21] and applying to those hours the historical average rates that would be charged by southern New Jersey lawyers of like experience, again as disclosed in Appendix A. This would have provided a total fee to the Terris firm of

$291,681.29. From that sum, there was deducted 392 specific hours found excessive or improper at a calculated rate of $87 per hour, being the overall approximate average hourly rate for southern New Jersey lawyers covering the entire period from 1983 through 1988. This sum of $34,104 was deducted from the $291,681.29, leaving a balance of $257,577.29. That balance was further reduced by 20% for nonspecific excess work and charges for the reasons previously stated. Ms. Butler's and Mr. Gordon's claimed hours were allowed in full, but at the southern New Jersey rates.

The methodology utilized is a slight variation from the standard application of calculating the reasonable number of hours multiplied by a reasonable hourly rate based on historical charges. Instead, the historical southern New Jersey rates were applied to all claimed hours. Deducted from this amount were certain specific excessive hours of claimed work, although in most cases, because of the nature of plaintiffs' submissions, it could not be ascertained by which lawyer or during which period of time the excessive work was performed. Consequently, those specific hours were calculated on the overall average fee charged by southern New Jersey lawyers during the course of this litigation. After these deductions were made for the specific items, a total reduction of 20% of the resulting figure was made to reflect nonspecific excessive expenditure of time. The submissions by plaintiffs' counsel make impossible a line-by-line and item-by-item analysis. Consequently, the various summaries and especially Appendix A calculations appear to be the only practical and logical sources available to determine a reasonable fee applying Third Circuit case law.

Plaintiffs' counsel will be awarded as reasonable attorneys' fees and litigation costs, the following:

---

**21.** Appendix A is taken from defendant's exhibit 38. Defendant's exhibit 38 is, in turn, based upon plaintiffs' counsel's hourly claims set forth historically in plaintiffs' exhibit 4, at 34–35. Although exhibit 38 is defendant's exhibit, I have compared the figures therein to plaintiffs' exhibit and believe they accurately quote the number of hours claimed in plaintiffs' fee petition. *Compare* Plaintiffs' Ex. 4, at 34–35 *with* Defendant's Ex. 38.

Terris, Edgecombe, Hecker & Wayne

|  | Claimed | Awarded | Totals |
|---|---|---|---|
| Attorneys' Fees | $789,400.16 | $206,061.83 | |
| Paralegal Fees | 25,351.25 | 15,519.50 | |
| | | $221,581.33 | $221,581.33 |

Litigation Expenses:

|  | Claimed | Awarded | Totals |
|---|---|---|---|
| Photocopying/Bonding | 10,483.00 | 1,048.30 | |
| Postage | 1,873.00 | 224.76 | |
| Telephone | 1,081.03 | 1,081.03 | |
| Travel | 10,808.38 | 7,205.59 | |
| Courier Service/ Secretarial Over-time | 1,521.83 | –0– | |
| Documents | 134.10 | 134.10 | |
| Expert Witness Fees | 81,197.27 | 32,478.91 | |
| Transcripts/Misc. | 5,795.49 | 5,795.49 | |
| | $112,894.10 | $ 47,968.18 | $ 47,968.18 |
| Total to Terris Firm | | | $269,549.51 |
| Ms. Butler | $ 2,375.00 | $ 1,140.00 | $ 1,140.00 |
| Mr. Gordon | $ 4,678.00 | $ 3,301.01 | $ 3,301.00 |

## APPENDIX A

APPENDIX A is a compilation of plaintiffs' counsel's hours claimed spent specifically on the *Monsanto* litigation, as set forth in Plaintiffs' Ex. 4, at 34–35, and "average" (as opposed to "minimum") southern New Jersey rates for attorneys of similar experience, for similar type litigation, as supported by the affidavits contained in Defendant's Ex. 19–34, 58–60. *See also* Defendant's Ex. 61 (summary/comparison of difference between Washington, D.C., and southern New Jersey rates).

COMPARISON OF LODESTAR USING AVERAGE NEW JERSEY MARKET RATES

MONSANTO SPECIFIC

| ATTORNEY | YEAR | LEVEL | HOURS | PLAINTIFFS' FEE APPLICATION RATES | TOTALS | AVERAGE NEW JERSEY MARKET RATES RATES | TOTALS |
|---|---|---|---|---|---|---|---|
| Terris | 1983 | 20 + yrs | 42.25 | $185 | $7,816.25 | $77.50 | $3,274.38 |
| | 1984 | 20 + yrs | 23.75 | 185 | 4,393.75 | 90.00 | 2,137.50 |
| | 1985 | 20 + yrs | 4.50 | 200 | 900.00 | 90.00 | 405.00 |
| | 1986 | 20 + yrs | 1.50 | 200 | 300.00 | 107.50 | 161.25 |
| | 1987 | 20 + yrs | 85.25 | 225 | 19,181.25 | 117.50 | 10,016.88 |
| | 1988 | 20 + yrs | 136.50 | 225 | 30,712.50 | 125.00 | 17,062.50 |
| Sunderland | 1984 | 20 + yrs | 86.00 | 150 | 12,900.00 | 90.00 | 7,740.00 |
| | 1985 | 20 + yrs | 449.50 | 160 | 71,920.00 | 90.00 | 40,455.00 |
| | 1986 | 20 + yrs | 109.50 | 175 | 19,162.50 | 107.50 | 11,771.25 |
| Pravlik | 1983 | 1–3 yrs | 175.75 | 85 | 14,938.75 | 55.00 | 9,666.25 |
| | 1984 | 1–3 yrs | 42.75 | 85 | 3,633.75 | 60.00 | 2,565.00 |
| | 1984 | 4–6 yrs | 253.50 | 110 | 27,885.00 | 70.00 | 17,745.00 |
| | 1985 | 4–6 yrs | 586.25 | 110 | 64,487.50 | 80.00 | 46,900.00 |
| | 1986 | 4–6 yrs | 173.25 | 125 | 21,656.25 | 82.50 | 14,293.13 |
| | 1987 | 4–6 yrs | 33.25 | 125 | 4,156.25 | 95.00 | 3,158.75 |
| | 1987 | 7–10 yrs | 240.50 | 160 | 38,480.00 | 100.00 | 24,050.00 |
| | 1988 | 7–10 yrs | 245.75 | 160 | 39,320.00 | 107.50 | 26,418.13 |

| ATTORNEY | YEAR | LEVEL | HOURS | PLAINTIFFS' FEE APPLICATION | | AVERAGE NEW JERSEY MARKET RATES | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | RATES | TOTALS | RATES | TOTALS |
| Edgecombe | 1986 | 7–10 yrs | 0.25 | $145 | $36.25 | $87.50 | $21.88 |
| | 1987 | 7–10 yrs | 12.75 | 160 | 2,040.00 | 100.00 | 1,275.00 |
| | 1988 | 7–10 yrs | 0.50 | 160 | 80.00 | 107.50 | 53.75 |
| Hecker | 1983 | 4–6 yrs | 11.25 | 110 | 1,237.50 | 60.00 | 675.00 |
| | 1984 | 4–6 yrs | 3.00 | 110 | 330.00 | 70.00 | 210.00 |
| | 1984 | 7–10 yrs | 60.50 | 125 | 7,562.50 | 80.00 | 4,840.00 |
| | 1985 | 7–10 yrs | 7.25 | 135 | 978.75 | 80.00 | 580.00 |
| | 1986 | 7–10 yrs | 2.00 | 145 | 290.00 | 87.50 | 175.00 |
| | 1987 | 7–10 yrs | 20.25 | 160 | 3,240.00 | 100.00 | 2,025.00 |
| | 1988 | 7–10 yrs | 6.25 | 160 | 1,000.00 | 107.50 | 671.88 |
| Wayne | 1987 | 7–10 yrs | 164.00 | 160 | 26,240.00 | 100.00 | 16,400.00 |
| | 1988 | 7–10 yrs | 158.50 | 160 | 25,360.00 | 107.50 | 17,038.75 |
| Wagner | 1983 | 1–3 yrs | 0.50 | 85 | 42.50 | 55.00 | 21.25 |
| | 1988 | 4–6 yrs | 0.25 | 130 | 32.50 | 102.50 | 25.63 |
| Laudati | 1986 | 1–3 yrs | 36.50 | 95 | 3,467.50 | 62.50 | 2,281.25 |
| Meyer | 1983 | 1–3 yrs | 19.50 | 85 | 1,657.50 | 55.00 | 1,072.50 |
| Millian | 1987 | 1–3 yrs | 7.25 | 95 | 688.75 | 77.50 | 561.88 |
| Black | 1983 | 7–10 yrs | 26.50 | 125 | 3,312.50 | 65.00 | 1,722.50 |
| | 1984 | 7–10 yrs | 30.50 | 125 | 3,812.50 | 80.00 | 2,440.00 |
| | 1985 | 7–10 yrs | 0.75 | 135 | 101.25 | 80.00 | 60.00 |
| | 1985 | 11–14 yrs | 19.00 | 160 | 3,040.00 | 90.00 | 1,710.00 |
| TOTALS | | | 3,277.00 | | $466,393.75 | | $291,681.29 |
| Paralegals/ Law Clerks | 1983 | N/A | 65.50 | $40 | $2,620.00 | $32.50 | $2,128.75 |
| | 1984 | N/A | 85.00 | 40 | 3,400.00 | 32.50 | 2,762.50 |
| | 1985 | N/A | 244.75 | 45 | 11,013.75 | 35.00 | 8,566.25 |
| | 1986 | N/A | 14.00 | 45 | 630.00 | 37.50 | 525.00 |
| | 1987 | N/A | 41.75 | 50 | 2,087.50 | 40.00 | 1,670.00 |
| | 1988 | N/A | 112.75 | 50 | 5,637.50 | 42.50 | 4,791.88 |
| TOTALS | | | 451.00 | | $25,388.75 | | $20,444.38 |
| Butler | 1983 | 4–6 yrs | 19.00 | 125 | 2,375.00 | 60.00 | 1,140.00 |
| Gordon | 1983 | 1–3 yrs | 20.00 | 75 | 1,500.00 | 55.00 | 1,100.00 |
| | 1984 | 4–6 yrs | 18.50 | 100 | 1,850.00 | 70.00 | 1,295.00 |
| | 1985 | 4–6 yrs | 6.00 | 125 | 750.00 | 80.00 | 480.00 |
| | 1986 | 4–6 yrs | 0.25 | 125 | 31.25 | 82.50 | 20.63 |
| | 1987 | 7–10 yrs | 4.00 | 135 | 540.00 | 100.00 | 400.00 |
| | 1988 | 7–10 yrs | 0.05 | 135 | 6.75 | 107.50 | 5.38 |
| TOTALS | | | 49.00 | | $4,678.00 | | $3,301.01 |

## ORDER

For the reasons set forth in the foregoing opinion, judgment is entered in favor of plaintiffs and against defendant for attorneys' fees and expenses as follows:

Terris, Edgecombe, Hecker and Wayne, the sum of Two Hundred Sixty–Nine Thousand Five Hundred Forty–Nine Dollars and Fifty–One Cents ($269,549.51); Kathleen Butler, the sum of One Thousand One Hun-

dred and Forty Dollars ($1,140.00); Michael Gordon, the sum of Three Thousand Three Hundred and One Dollars and One Cent ($3,301.01).